**DUMAS & VAUGHN, LLC**
ASHLEY L. VAUGHN, OSB #114691
E-mail: ashley@dumasandvaughn.com
1000 SW Broadway, Suite 2150
Portland, OR 97205
Phone: 503-616-5007

**ROGUE LAW FIRM PC**
THOMAS R. ADAMS, OSB # 116588
E-mail: tom@roguelawfirm.com
600 NW Fifth St.
Grants Pass, OR 97526
Phone: 503-445-2103

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| T.F., an individual proceeding under pseudonym,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF OREGON, by and through the OREGON YOUTH AUTHORITY; DIRECTOR KAREN BRAZEAU, an individual; DIRECTOR ROBERT JESTER, an individual; SUPERINTENDENT GARY LAWHEAD, an individual; UNKNOWN DIRECTORS #1-3, individuals; and UNKNOWN SUPERINTENDENTS #1-3, individuals.<br><br>Defendants. | Case No. 6:25-cv-02166<br><br>**COMPLAINT**<br><br>**Civil Rights Violations (42 U.S.C. § 1983); Negligence; Child Sexual Abuse**<br><br>**JURY TRIAL DEMANDED** |

**NATURE OF CASE**

1.  Plaintiff T.F. ("Plaintiff") was sexually molested by Dr. Gary Edwards, aka "Dr. Cold Fingers," in 2003 and 2004 when he was a teenage boy committed to the care and custody of the Oregon Youth Authority ("OYA"). OYA is a state agency operating youth correctional facilities and transition programs throughout Oregon; its stated purpose is, in part, to "provide youth with treatment, education, and other guidance to help them take responsibility for their behavior" and "do so in safe, supportive environments that will help them become responsible, community-minded citizens."[1] Plaintiff became a ward of OYA in 2003 when he was 17. Plaintiff had initial intake physicals and subsequent medical care at MacLaren Youth Correctional Facility in Woodburn, Oregon ("MacLaren"). Dr. Edwards, a long-time pediatrician providing medical care to youth at MacLaren since 1977, performed his physicals. During Plaintiff's medical appointments, Dr. Edwards sexually abused Plaintiff. Unknown to Plaintiff prior to that point, Dr. Edwards was referred to by MacLaren administration, staff, and other youth as "Dr. Cold Fingers," for his ungloved abuse of inmates during his "medical" exams. Rather than report Dr. Edwards or take other action to prevent his continued abuse of incarcerated youth, MacLaren leadership instead ignored and sometimes weaponized Dr. Edwards' well-known actions, resulting in his continued abuse of youth like Plaintiff for years.

**PARTIES**

2.  Plaintiff T.F. is a 39-year-old male resident of Oregon. At all relevant times, Plaintiff was a child in the legal and physical custody of OYA as an adjudicated youth. Plaintiff is proceeding under his initials to protect his privacy.

3.  OYA is a state agency operated by the State of Oregon. OYA operates facilities across Oregon where youth offenders are incarcerated and treated, including MacLaren.

---

[1] *About Oregon Youth Authority*, https://www.oregon.gov/oya/about-oya/pages/default.aspx (last visited Feb. 13, 2025).

Page 1 -   **COMPLAINT**

4.	Defendant Karen Brazeau ("Defendant Brazeau") was employed by the State of Oregon as the Director of OYA from in or around 2001 through in or around 2004. All of the conduct alleged below occurred within the scope of her employment for OYA. She is sued in her individual capacity.

5.	Defendant Robert Jester ("Defendant Jester") was employed by the State of Oregon as the Director of OYA from in or around 2004 through in or around 2008. All of the conduct alleged below occurred within the scope of his employment for OYA. He is sued in his individual capacity.

6.	Defendant Gary Lawhead ("Defendant Lawhead") was employed by the State of Oregon as the Superintendent of MacLaren from 2002 through 2005. All of the conduct alleged below occurred within the scope of his employment for OYA. He is sued in his individual capacity.

7.	Based on information and belief, Defendants Unknown Directors and Unknown Superintendents are unknown individuals employed by Defendant OYA who were aware of reports and risks that Dr. Edwards posed a danger of sexual abuse to youth in OYA custody prior to 2003. All conduct alleged below occurred within the scope of their employment for OYA. They are sued in their individual capacity. Defendant Brazeau, Defendant Jester, Defendant Lawhead, and Defendants Unknown Directors and Superintendents are referred to below as "Individual Defendants."

## OYA'S FAILURE TO ADDRESS SEXUAL ABUSE COMPLAINTS

8.	County courts commit youth to OYA's legal and physical custody following youths' adjudication, and OYA serves adjudicated youths between the ages of 12 and 25.

9.	OYA's youth correctional facilities include Eastern Oregon Youth Correctional Facility, MacLaren Youth Correctional Facility, Oak Creek Youth Correctional Facility, Rogue

Valley Youth Correctional Facility, Tillamook Youth Correctional Facility, and formerly Hillcrest Youth Correctional Facility, which is now closed (hereinafter collectively "youth correctional facilities"). OYA's transition programs include Camp Florence Youth Transitional Facility, Camp Riverbend Transitional Facility, Camp Tillamook Youth Transitional Facility, and Jackie Winters Youth Transition Program.

10. The 2003 Prison Rape Elimination Act ("PREA")[2] established federal standards for preventing, detecting, monitoring, and responding to sexual abuse in both adult and juvenile custody settings. "With a goal of being a national leader," OYA boasted that it quickly implemented PREA's standards. On information and belief, PREA's passage was partially in reaction to localized awareness (including within OYA) of a sustained and systemic problem of sexual abuse of adjudicated youth in youth correctional facilities.

11. Beginning in 2005, OYA claimed it committed to "a zero-tolerance policy towards sexual and other threats of harm" as part of its implementation of PREA.[3] OYA created a Professional Standards Office ("PSO") to purportedly document, track, and investigate abuse allegations. OYA staff were also required to report any knowledge, suspicion, or youth reports (verbal or written) of abuse or harassment. OYA established (1) a toll-free hotline that adjudicated youth could call to report sexual abuse and (2) a PREA compliance manager for each OYA facility. Prior to OYA's establishment of the PSO in 2005, little to no OYA processes or policies existed for monitoring, reporting, investigating, and tracking allegations of sexual abuse committed by OYA personnel against juveniles in OYA's custody and control.

12. Despite OYA's nominal PREA compliance, OYA has a long history of ignoring reports of staff sexually abusing youth in its facilities and fostering an environment where unchecked sexual abuse could thrive. This environment stems in part from OYA failing to start

---

[2] Oregon Youth Authority Issue Brief: Protecting Youth Offenders from Sexual Victimization (Feb. 2011).
[3] *Id*.

Page 3 -     **COMPLAINT**

or complete investigations of complaints involving staff sexual misconduct against youth; failing to complete functional investigations of staff sexual misconduct against youth; failing to report and/or intervene when staff or supervisors have reason to know or suspect that staff are committing sexual misconduct against youth; failing to ensure staff report concerns about sexual misconduct against youth; failing to properly train staff and supervisors, including on the PREA; failing to properly discipline staff; failing to install video surveillance to deter sexual misconduct; and failing to institute or properly implement policies that would protect youth from sexual misconduct by staff.

13. Recently, OYA's systemic failures were exposed through a series of lawsuits and reports documenting ignored and unaddressed reports of sexual violence against youth in OYA custody dating back to at least the 1990s.

14. In 2021, an OYA audit identified "significant concerns" with PREA implementation within OYA. The audit found that PREA coordinators were not reporting to the appropriate personnel within OYA and that at least one PSO Chief Investigator had mishandled PREA investigations.

15. In 2025, the Oregon Department of Corrections ("DOC") released an OYA audit that found "significant" issues within the PSO department.[4] The audit determined that since 2018, the OYA failed to complete approximately 32% of investigations (i.e., approximately 733 cases) involving allegations of abuse. Further, potentially thousands of cases may have been investigated but not reviewed for appropriate disposition by the agency (i.e., corrective action or

/ / /

---

[4] "Oregon Youth Authority investigator failed to review thousands of cases, report finds," *Statesman Journal*, https://www.centraloregondaily.com/news/regional/oregon-youth-authority-investigator-caseslapse/article_881b7e9a-006a-11f0-86fa-27b9ce1acb0a.html (Mar. 13, 2025) (last visited June 20, 2025).

Page 4 -   **COMPLAINT**

law enforcement referral).[5]  As of March 13, 2025, the audit identified over 3,400 cases with unknown adjudication.[6]

16.    The audit also discovered that several current and former staff reported to OYA leadership a "significant concern that the safety of the youth was at risk."[7]

17.    On March 13, 2025, Oregon's Department of Administrative Services ("DAS") released an Investigation Report (DAS Investigation Report) regarding allegations of mismanagement and governmental misconduct at the OYA.

18.    The DAS Investigation Report uncovered that during the DOC audit, "Several current and past OYA employees of the PSO allegedly reported the referenced problems with the youth cases to OYA administrators (past and present).  These reports were allegedly met with an apathetic or passive response to the associated safety concerns of youth in custody.[8]

19.    As part of the DAS investigation, a different OYA former staffer was asked whether issues with the PSO impacted youth and staff safety.  The staffer replied, "Yes it did" and "There's no other way to answer that question."  The staffer added, "The kids deserve to be safe."[9]

20.    The DAS Investigation Report also sustained findings that key staff members engaged in improper governmental conduct from at least 2018 through 2021 by their inability or unwillingness to appropriately manage the agency's PSO.  This conduct contributed to the

/ / /

/ / /

---

[5]    Oregon Dep't of Admin. Servs., Investigation Report, Case No. 123520 at 4 (Mar. 13, 2025). Investigator: Travis Hampton, Investigator, Chief Human Resources Office ("DAS Report").
[6]    *Id*.
[7]    *Statesman Journal*, https://www.statesmanjournal.com/story/news/local/oregon/2025/03/13/audit-oregon youth-authority-investigatorfailed-review-cases/82369073007/ (last visited June 20, 2025).
[8]    DAS Report, at 7.
[9]    *Id*. at 17.

Page 5 -    **COMPLAINT**

inefficient operations of the agency and undermined the state's ability to fulfill its public mission to youth and staff.[10]

21. Although the DAS Report only covered allegations dating back to 2019, there is no evidence to suggest that OYA had a *more* effective system for redressing sexual abuse allegations—including its implementation and compliance with PREA, management of PSO, and overall response to such allegations—*prior to* 2019. In fact, as discussed more below, all evidence surrounding OYA's handling of allegations against Dr. Edwards shows that the DAS Report merely shed light on the most recent iteration of OYA's ineptitude and malfeasance.

## DOCTOR "COLD FINGERS" EDWARDS

22. At all relevant times, Dr. Edwards was employed or otherwise working on behalf of OYA as a pediatrician providing medical examination, diagnoses, and treatment to youths at MacLaren. He had been employed by OYA since 1977. Dr. Edwards was the primary medical provider at MacLaren from at least the late 1990s through at least 2007. Upon information and belief, Dr. Edwards was the only doctor working on site full-time at MacLaren during this time and, as such, oversaw the medical care for all adjudicated youth at MacLaren, including performing intake examinations, periodic physicals, and similar examinations.

23. He was infamous for groping boys' genitals and penises with cold, ungloved hands during exams for no legitimate medical reason; digital penetration of boys' anuses; stroking boys' penises until erect; and masturbating boys, including in some instances to ejaculation. Dr. Edwards sexually abused children during intake exams, follow-up physicals, and unrelated medical visits in his exam room when no nurse or chaperone was present. As the sole doctor at MacLaren, Dr. Edwards handled all intake exams, physicals, and treatment of any reported medical issues.

/ / /

---

[10] *Id.* at 11.

Page 6 -   **COMPLAINT**

24.     Dr. Edwards' abuse of boys was common knowledge amongst both the adjudicated youth and OYA staff, so much so that they dubbed him "Dr. Cold Fingers" and joked about him. Older adjudicated youth warned newly arrived boys about Dr. Edwards. MacLaren staff made jokes about Dr. Edwards abusing adjudicated youth. Corrections officers threatened to send juveniles to Dr. Edwards as punishment if they misbehaved.

25.     Prior to Dr. Edwards's molestation of Plaintiff in or around 2003 and 2004, multiple other youth had reported Dr. Edwards to staff and counselors at MacLaren, but nothing was done to prevent his continued molestation of inmates. As alleged in other pending lawsuits:

   a.     1999: Plaintiff E.N. alleges that Dr. Edwards sexually molested him multiple times beginning in 1999. He alleges that OYA staff members threatened to send youth to Dr. Edwards as punishment. *M.B., et al. v. State of Oregon, et al.*, Or. Circ. Ct. (Mult. Co. 25CV14777), ¶ 65;

   b.     2002: Plaintiff T.B. alleges that Dr. Edwards sexually molested him multiple times beginning in or around 2002. He alleges that he reported the abuse to a MacLaren staff member, who laughed it off and said, "That's Dr. Cold Fingers for you." *M.P., et al. v. State of Oregon, et al.*, Or. Circ. Ct. (Mult. Co. 25CV27198), ¶¶ 46-48;

   c.     2001-2004: Plaintiff M.K. alleges that Dr. Edwards sexually molested him multiple times during medical examinations between in or around 2001 and 2004. He alleges that he reported the abuse to a male staff person and during periodic polygraph examinations during but, to his knowledge, no action was taken against Dr. Edwards. *M.B.,* ¶ 53;

   d.     2002: Plaintiff B.N. alleges that Dr. Edwards sexually molested him multiples times beginning in or around 2002. He alleges that he reported to a nurse before one examination that he did not want Dr. Edwards to grope him again. He and other youth also openly discussed Dr. Edwards's conduct in the presence of OYA staff members. *M.P.*, ¶¶ 70-72;

    e. 2002-2004: Plaintiff V.K. alleges that Dr. Edwards sexually molested him when he was 12 years old, in or around 2002 through 2004. He alleges that OYA staff threatened to send him to "Dr. Cold Fingers" if he misbehaved. *A.C., et al. v. State of Oregon, et al.,* Or. Circ. Ct. (Mult. Co. 25CV35433), ¶¶ 63-65;

    f. 2003: Plaintiff A.B. alleges that Dr. Edwards sexually molested him multiple times in or around 2003. He alleges that he and other youth openly discussed Edwards's conduct in the presence of OYA staff members. *M.P.*, ¶¶ 59-61;

    g. 2003-2004: Plaintiff N.N. alleges that Dr. Edwards sexually molested him multiple times in or around 2003 to 2004. He alleges that he reported Dr. Edwards's abuse to a guard, who responded "Yeah, he [Edwards] does that." He alleges that he also reported the abuse to a nurse who asked him how he knew the conduct was inappropriate, if he was not a doctor. *M.P.*, ¶¶ 52-55; and

    h. 2003-2004: Plaintiff C.S. alleges that Dr. Edwards sexually molested him multiple times in or around 2003 to 2004. He alleges that OYA staff warned him about Dr. Edwards when he arrived at MacLaren. *M.B.*, ¶ 73.

  26. Numerous other plaintiffs in other lawsuits allege they were sexually abused by Dr. Edwards prior to or during 2003, but do not claim to have reported the abuse to OYA staff or leadership at the time.

  27. OYA empowered Dr. Edwards to perform the duties of a doctor. OYA knew that Dr. Edwards was in a position of authority, power, and trust over adjudicated youth, including Plaintiff. OYA retained the right to control the means and methods used by Dr. Edwards. It was during the course of exercising these duties and authority on behalf of OYA that Dr. Edwards abused Plaintiff.

/ / /

/ / /

Page 8 - **COMPLAINT**

## PLAINTIFF'S ABUSE

28.     Plaintiff realleges and incorporates by reference paragraphs 1-27.

29.     Plaintiff was adjudicated as an adult in Multnomah County, Oregon and sentenced to the custody of Defendant OYA in or around July 14, 2003, when he was 17 years old. Plaintiff had never been previously criminally convicted or incarcerated.

30.     At the outset of his incarceration, Defendant OYA sent Plaintiff to MacLaren to complete his initial intake, as OYA did with all youth at the time before transferring them to different facilities.

31.     Part of Plaintiff's initial intake included a physical examination, performed by Dr. Edwards.  Initial physical examinations were standard procedure for incarcerated youth with OYA, but not having been previously incarcerated, Plaintiff did not know what to expect for the physical.

32.     Upon arrival to MacLaren, Plaintiff was assigned to Tent C.  Before the physical, intake staff joked about Dr. Edwards and told Plaintiff that Dr. Edwards was inappropriate, which made Plaintiff feel uncomfortable.  During the physical, Dr. Edwards did not wear gloves. He instructed Plaintiff to lie down and proceeded to fondle his genitals for several minutes.

33.     Plaintiff had additional intake physicals with Dr. Edwards during his time in custody, when he was moved in and out of Grover Cottage; each time he returned, he had to have another intake physical.  He also visited Dr. Edwards one time for an ankle sprain.  Each time he had another physical, Dr. Edwards fondled his genitals.  To the best of his recollection at this time, Edwards abused him at least four to five times.

34.     To the best of his recollection at this time, Plaintiff believes that he filed three to four complaints regarding Edwards' inappropriate conduct through the formal grievance system, but to his knowledge, no action was taken against Dr. Edwards.

/ / /

Page 9 -    **COMPLAINT**

35. As a direct and proximate result of Defendants' tortious conduct, Plaintiff suffered in the past, continues to suffer, and will suffer in the future psychological injuries, including but not limited to pain and suffering and emotional distress. All of these injuries caused and will continue to cause Plaintiff noneconomic damages an amount to be determined by a jury at trial.

36. Less than two years before the filing of this complaint, Plaintiff discovered the casual connection between his abuse, his resulting injuries distinct from the abuse itself, and the responsibility of Defendants in causing those injuries. Plaintiff did not discover (and could not reasonably have discovered) at an earlier time the casual connection between the abuse and the damages suffered because of the abuse, particularly because Plaintiff did not understand at the time of the molestation that such conduct constituted child abuse. Further, even if he had understood that Dr. Edwards's conduct was wrong at the time, he was prevented from telling any responsible adults about the conduct out of fear of punishment, recrimination, and retaliation. Finally, Plaintiff did not and could not reasonably have discovered Defendants' prior knowledge of Dr. Edwards's inappropriate conduct, as well as Defendants' responsibility for Plaintiff's abuse, until the publishing of news articles in March of 2025 making those facts public for the first time.

**SUPERVISORY LIABILITY**

37. Plaintiff realleges and incorporates by reference paragraphs 1-36.

38. Directors and Superintendents were employed by the OYA at the time that Dr. Edwards sexually abused Plaintiff. They were aware of OYA's long history of turning a blind eye to reports of staff sexually abusing youth at its facilities. They failed in their respective supervisory roles to prevent the sexual abuse of Plaintiff, including the following failures:

    a. Failing to investigate reports of abuse properly or at all;

    b. Failing to refer known incidents to outside investigative agencies;

      c.      Failing to install sufficient security and monitoring equipment at McLaren, Hillcrest, and Riverbend to deter the abuse of minors;

      d.      Failing to properly implement, monitor, and sustain PREA standards, including timely appointment of PREA Compliance Manger and ensuring adherence at MacLaren and all other facilities to the rules and guidelines set out by PREA and implemented by the OYA;

      e.      Failing to implement policies and procedures to adequately vet job applicants, particularly for those positions requiring one-on-one interaction with juveniles, for a history of or proclivity to child sex abuse;

      f.      Failing to train OYA's employees to recognize and properly respond to warning signs and dangers of child abuse and to report any and all signs or reports of sexual abuse; and

      g.      Facilitating a general culture in which the abuse of juveniles was accepted.

39.      The State of Oregon and OYA are entrusted with the rehabilitation of children adjudged delinquent. When the State imprisons these vulnerable children in detention facilities and thereby removes them from their families and their communities, the State removes their opportunities for self-protection, and the State is instead entrusted with caring for and protecting these completely dependent youth.

40.      Given the vulnerability of the juvenile population housed at OYA facilities, the OYA's history of a sustained and systemic problem of youth in its custody being targeted for sexual assault, and the widespread knowledge among MacLaren staff and adjudicated youth of Dr. Edwards' predatory nature, a supervisor exercising a reasonable amount of care would have immediately noticed and recognized the predatory threat that Dr. Edwards represented to Plaintiff.

41.     By failing to ensure that the policies enacted by his own agency to prevent, investigate, and respond to sexual abuse were followed or enforced, and by ignoring credible information that staff – including "Dr. Cold Fingers" – were engaging in sexual abuse of youth, Director consciously disregarded widespread sexual abuse of youth at OYA facilities, thus creating the conditions that allowed Dr. Edwards to sexually abuse Plaintiff.  This behavior evinced a deliberate indifference to Plaintiff's right to be free from coerced sexual contact.

42.     By failing to ensure that OYA's policies to prevent, investigate, and respond to sexual abuse were followed or enforced at MacLaren, and by ignoring credible information that staff – including "Dr. Cold Fingers" – were engaging in coercive sexual relationships with youth, Directors and Superintendents consciously disregarded widespread sexual abuse of youth at MacLaren, thus creating the conditions that allowed Dr. Edwards to sexually abuse Plaintiff.

**FIRST CLAIM FOR RELIEF:**

**NEGLIGENCE**
(Oregon State Law)
*Against State of Oregon, OYA*

43.     Plaintiff realleges and incorporates herein paragraphs 1-42.

44.     By taking custody of Plaintiff and *acting in loco parentis* towards him during the period of his confinement, Defendant OYA entered into a special relationship with Plaintiff.  At all material times, Defendants were in a special relationship with Plaintiff by virtue of their statutory obligations to children in their care generally, and to Plaintiff specifically.  As their legal and physical guardian and custodian, Defendants owed Plaintiff a heightened duty of care to provide a safe environment and protect him from abuse and injury while in OYA's care.

45.     Defendant OYA breached that duty by acting or failing to act in one or more of the following ways.  Additionally, Defendant OYA created a foreseeable risk that incarcerated youth, including Plaintiff, would suffer the type of harm that Plaintiff eventually suffered—

sexual abuse by Dr. Edwards—by unreasonably acting or failing to act in one or more of the following ways:

    a.    Failing to ensure that a chaperone or other staff person was present to observe Dr. Edwards's examinations of youth;

    b.    Failing to notice, investigate, or intervene to protect Plaintiff from Dr. Edwards sexual conduct;

    c.    Failing to properly supervise Dr. Edwards;

    d.    Failing to properly heed, investigate, or otherwise take any action in response to reports of inappropriate conduct and sexual abuse by Dr. Edwards;

    e.    Failing to report or refer reports of inappropriate conduct and sexual abuse by Dr. Edwards to outside investigative agencies;

    f.    Failing to establish a safe and confidential reporting system for youth to report allegations of wrongdoing by staff members;

    g.    Failing to ensure that youth were educated about and using any existing reporting systems to report allegations of wrongdoing by staff members; and

    h.    Failing to properly vet, hire, train, and retain qualified personnel, including medical providers, corrections officers, and other facility staff.

46.    Further, Plaintiff had a legally protected interest in being free from sexual abuse by OYA staff in charge of his safety and wellbeing.

47.    Based on Defendant OYA's knowledge of Dr. Edwards's inappropriate conduct predating or coinciding with his abuse of Plaintiff, as partially described above at paragraphs 25, OYA allowed or permitted child abuse.

48.    As a direct and foreseeable result of Defendant OYA's negligence, Plaintiff suffered the injuries and incurred the damages described in paragraph 35.

/ / /

Page 13 -   **COMPLAINT**

## SECOND CLAIM FOR RELIEF:

**42 U.S.C. §1983 – Civil Rights Violation**
(Substantive Due Process – Violation of 14th Amendment)
*Against all Individual Defendants*

49. Plaintiff realleges and incorporates by reference paragraphs 1-42.

50. At all relevant times, all Individual Defendants were employed by Defendant OYA as employees of a youth correctional facility.

51. All Individual Defendants were acting under color of state law when they engaged in the alleged wrongful conduct.

52. Plaintiff was confined at MacLaren as an adjudicated youth at the time Dr. Edwards abused him.

53. Even though Dr. Edwards may have initially acted out of a desire to fulfill his responsibilities as a pediatrician for OYA, he eventually touched Plaintiff in a sexual manner without a legitimate penological or medical justification or purpose.

54. Even though Dr. Edwards may have initially acted out of a desire to fulfill his responsibilities as a pediatrician for OYA, he eventually touched Plaintiff in a sexual manner that was not reasonably related to any legitimate government objective.

55. Dr. Edwards acted, at least in part, for his own sexual gratification.

56. Dr. Edwards's sexual abuse of Plaintiff constituted a substantial departure from professional judgment, practice or standards.

57. Dr. Edwards failed to provide for Plaintiff's reasonable safety while confined in OYA facilities by engaging in coerced sexual conduct with Plaintiff.

58. Through the failures alleged above, Individual Defendants created the conditions at MacLaren, under which Dr. Edwards's sexual abuse of Plaintiff was possible.

59. Those conditions put Plaintiff at substantial risk of suffering serious harm, namely, the risk that Plaintiff would be sexually abused by OYA staff or employees.

60. Individual Defendants failed to take reasonable available measures to abate the risk that Plaintiff would be sexually abused by Dr. Edwards.

61. Individual Defendants, in failing to act or protect Plaintiff from sexual abuse by Dr. Edwards, failed to provide for Plaintiff's reasonable safety.

62. Individual Defendants' failure to take reasonably available steps, as alleged above, constituted a substantial departure from professional judgment, practice, or standards.

63. In so doing, given Defendants' knowledge of OYA's history and allegations against Dr. Edwards, Individual Defendants evinced deliberate indifference to Plaintiff's rights to be free from coerced sexual contact with Dr. Edwards.

64. As a direct and foreseeable result of Defendant OYA's negligence, Plaintiff suffered the injuries and incurred the damages described in paragraph 35.

65. Pursuant to 42 U.S.C. § 1988, Plaintiff is entitled to recover reasonable and necessary attorney fees and costs incurred in the prosecution of this action.

**THIRD CLAIM FOR RELIEF:**

**42 U.S.C. §1983 – Civil Rights Violation**
(Cruel and Unusual Punishment – Violation of 8th Amendment)
*Against All Individual Defendants*

66. Plaintiff realleges and incorporates by reference paragraphs 1-42.

67. At all relevant times, all Individual Defendants were employed by Defendant OYA as employees of a youth correctional facility.

68. All Individual Defendants were acting under color of state law when they engaged in the alleged wrongful conduct.

69.     Plaintiff was confined at MacLaren as an adjudicated youth at the time Dr. Edwards abused him.

70.     Even though Dr. Edwards may have initially acted out of a desire to fulfill his responsibilities as a pediatrician for OYA, he eventually touched Plaintiff in a sexual manner without a legitimate penological or medical justification or purpose.

71.     Even though Dr. Edwards may have initially acted out of a desire to fulfill his responsibilities as a pediatrician for OYA, he eventually touched Plaintiff in a sexual manner that was not reasonably related to any legitimate government objective.

72.     Dr. Edwards acted, at least in part, for his own sexual gratification.

73.     Dr. Edwards's sexual abuse of Plaintiff constituted a substantial departure from professional judgment, practice or standards.

74.     Dr. Edwards failed to provide for Plaintiff's reasonable safety while confined in OYA facilities by engaging in coerced sexual conduct with Plaintiff.

75.     Through the failures alleged above, Individual Defendants created the conditions at MacLaren, under which Dr. Edwards's sexual abuse of Plaintiff was possible.

76.     Those conditions put Plaintiff at substantial risk of suffering serious harm, namely, the risk that Plaintiff would be sexually abused by OYA staff or employees.

77.     Individual Defendants failed to take reasonable available measures to abate the risk that Plaintiff would be sexually abused by Dr. Edwards.

78.     Individual Defendants' failure to take reasonably available steps, as alleged above, constituted a substantial departure from professional judgment, practice, or standards.

79.     In so doing, given Defendants' knowledge of OYA's history and allegations against Dr. Edwards, Individual Defendants evinced deliberate indifference to Plaintiff's rights to be free from coerced sexual contact with Dr. Edwards.

80. As a direct and foreseeable result of Defendant OYA's negligence, Plaintiff suffered the injuries and incurred the damages described in paragraph 35.

81. Pursuant to 42 U.S.C. § 1988, Plaintiff is entitled to recover reasonable and necessary attorney fees and costs incurred in the prosecution of this action.

### FOURTH CLAIM FOR RELIEF:

**Sexual Battery of Child –** *Vicarious Liability*
(Oregon State Law)
*Against Defendant OYA*

82. Plaintiff realleges and incorporates by reference paragraphs 1-42.

83. While acting in the course and scope of his agency for Defendant OYA, Dr. Edwards engaged in a harmful or offensive touching of Plaintiff to which Plaintiff did not and could not consent, as described above.

84. Dr. Edwards performed his responsibilities as a pediatrician and created doctor-patient relationships with Plaintiff initially out of a desire to fulfill his duties for Defendant OYA. The actions he took as a pediatrician in purporting to examine Plaintiff led directly to and resulted in his sexual abuse of Plaintiff.

85. As a direct result and consequence of Defendants' wrongful conduct, Plaintiff suffered the injuries and incurred the damages alleged in paragraph 35.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against each Defendant, as follows:

1. If successful on any of Plaintiff's claims for relief, compensatory damages for Plaintiff in an amount to be determined by a jury at trial;

2. If successful on Plaintiff's Second and/or Third Claims for Relief, attorneys fees incurred, as allowed under 42 U.S.C. § 1988;

3.      Plaintiff's disbursements and incurred costs; and

4.      Any other relief this Court deems just and equitable.

## JURY DEMAND

Plaintiff demands a jury trial.

DATED this 21st day of November, 2025.

*/s/ Ashley L. Vaughn*
Ashley L. Vaughn, OSB #114691
**DUMAS & VAUGHN, LLC**

Thomas R. Adams, OSB # 116588
**ROGUE LAW FIRM PC**
*Attorneys for Plaintiff*